**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| KEVIN M. GREGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:08CV160 PPS |
| | ) | |
| IBEW LOCAL UNION 305, | ) | |
| FORT WAYNE ELECTRICAL JOINT | ) | |
| APPRENTICESHIP TRAINING | ) | |
| COMMITTEE, INC., NATIONAL | ) | |
| ELECTRICAL CONTRACTORS | ) | |
| ASSOCIATION, JOHN NESBITT, | ) | |
| DAVE LOVITT, AND | ) | |
| BRANDON MINIER, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Pro se plaintiff Kevin M. Gregg was a member of Local Union No. 305 of the

International Brotherhood of Electrical Workers, and an apprentice in a training program

operated by the Fort Wayne Electrical Joint Apprenticeship Training Committee (JATC). In

March of 2007, Gregg received a call on his cell phone while he was in a training classroom.

This supposedly violated JATC rules. A confrontation ensued between Gregg and his classroom

instructor resulting in Gregg's termination from the apprenticeship program. This lawsuit

against the JATC and Local 305 (and some of individuals involved in Gregg's termination)

followed.

Two summary judgment motions and two associated motions to strike are now pending

before me, one filed each by Local 305 and the JATC. The summary judgment motion filed by

the JATC is also made on behalf of individual defendants Nesbitt and Lovitt, who are JATC's Training Director and the President of the JATC Board of Trustees, respectively.[1]

There is one other individual defendant, Brandon Minier, but on June 11, 2009 counsel filed a suggestion of death [DE 104], reporting that Minier died April 26, 2009. In the event of the death of a party, Fed.R.Civ.P. 25(a)(1) provides for any interested party or a decedent's successor or representative to file a motion for substitution of a proper party to continue in the place of the decedent. The rule provides, however, that "[i]f the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Well more than a year has passed since Minier's death was suggested on the record, and no motion for substitution has been filed. Pursuant to Rule 25(a)(1) then, the claims against defendant Minier must be dismissed.

Because Mr. Gregg is a pro se plaintiff, his pleadings are granted a generous construction, and this, coupled with the generality of the pleading, requires that each claim be considered against each defendant. The third amended complaint is construed by the defendants in their motions for summary judgment to contain the following five sorts of claims, and Plaintiff Gregg has not objected to this characterization:

- claims under Title VII and §1981 for **race discrimination** in the form of hostile work environment, disparate treatment, and wrongful termination;

- claims of **retaliatory termination** for opposition to discriminatory treatment in violation of Title VII and §1981;

- **breach of contract**;

---

[1] The caption of the third amended complaint includes in its list of defendants "John Doe, et al." There is no mention of any John Doe elsewhere in the pleading. The reference to defendants "John Doe, et al." will therefore be disregarded.

- **intentional infliction of emotional distress**; and

- **violation of 29 U.S.C. §411** (§101 of the Labor-Management Reporting and Disclosure Act or **LMRDA**).

I agree that the defendants' characterization of Gregg's claims is a fair reading of his complaint and the voluminous record, and so my focus – consistent with the parties' request – will be on these claims. I will first take up the motions to strike and then the summary judgments.

## Motions to Strike

Defendants have filed motions to strike four of Gregg's many separate filings in response to the two summary judgment motions, namely:  Plaintiff's Statement of Undisputed Facts [DE 241] filed in opposition to JATC's summary judgment motion; Plaintiff's Statement of Undisputed Facts [DE 245] filed in opposition to Local 305's summary judgment motion; the Affidavit of Kevin M. Gregg [DE 247]; and the Affidavit & Exhibit Listings Index [DE 248].  I will treat the two Statements of Undisputed Facts as offering Gregg's version of the facts that he believes cannot reasonably be disputed.  Rather than strike these filings, I will consider which of the facts they assert are properly supported by cited evidence of record and which should be discounted because not facts at all, but argument.

As to Gregg's Affidavit [DE 247] and the massive Affidavit & Exhibit Listings Index [DE 248], I recognize the extent to which these documents are not proper affidavits and will give them only so much consideration as can properly be given.  In particular, I agree with defendants that the final column of the 49-page Exhibit Listing cannot, as Gregg urges, "be viewed as Gregg's testimony to the facts at hand," [DE 247, ¶4] and merely offers argument well beyond the page limits I set for Gregg's opposition to the summary judgment motions.  *See Order of 4/27/10* [DE 239]. This portion of the Listing will be disregarded.  Apparently somewhat

mollified by Gregg's reassurance that he was not attempting to pursue a summary judgment motion of his own, defendants have filed no reply memoranda in support of either motion to strike. With this explanation that the court perceives the shortcomings of the challenged filings and will give them only such consideration and weight as can be properly afforded them, the motions will be granted in part and denied in part accordingly.

## Motions for Summary Judgment

Two motions for summary judgment are before me. Where the admissible evidence, as construed in favor of the non-moving party, reveals no genuine issue as to any material facts and establishes that the moving party is entitled to judgment as a matter of law, such motions should be granted. Fed.R.Civ.P. 56(c)(2); *Swearnigen-El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010). "If there is sufficient evidence for a jury to return a verdict for the non-moving party, a genuine issue of material fact exists." *Berry v. Chicago Transit Authority*, __ F.3d __, 2010 WL 3294720 at *3 (7th Cir. Aug. 23, 2010), citing *Swearnigen-El*, 602 F.3d at 859. There is no genuine dispute of the following facts, except as otherwise noted.

The JATC is a six-member Board, three members from the National Electrical Contractors Association and three from the IBEW local union. Defendant Dave Lovitt served as the President of the Board. JATC operates a five-year apprenticeship program, in which apprentice electricians attend classes in the evening and work as employees of union electrical contractors during the day. JATC provides classroom instruction for the apprenticeship program, but is not an employer of apprentices. JATC employs a Training Director, who is defendant John Nesbitt. JATC is not itself a labor organization or a union. The apprentices are members of the IBEW and are subject to the collective bargaining agreement entered into by the

IBEW.  Kevin Gregg entered into an Apprenticeship Agreement to begin August 29, 2005.

During Gregg's tenure as an apprentice, he was the only African-American apprentice in the

program.

Apprentices are subject to various standards, policies and rules, including the "Local

Inside Wireman Apprenticeship and Training Standards for the Fort Wayne Electrical Joint

Apprenticeship and Training Committee," and the separate "Apprenticeship Policies" of the

JATC, both of which Gregg has received and reviewed.  The Training Standards provide that

whenever revisions or modifications are made to the Apprenticeship Policies, the apprentice will

be provided with a written copy and sign an acknowledgment of receipt.  The Apprenticeship

Policies address matters of conduct at the Training Center, including absences from class,

tardiness, and such prohibitions as "soiled/muddy work boots" and "head wear apparel" in class.

Board member Lovitt attests that in August of 2006, a set of "Classroom Rules" was

approved by the JATC Board.  These included a rule that cell phones must be turned off during

class hours, and a prohibition on food and beverages in classrooms while class is in session.  The

new Classroom Rules were posted on a JATC bulletin board and distributed to all the classroom

instructors, but don't appear to have been accomplished by a formal amendment to the

Apprenticeship Policies or to have been distributed to each apprentice.  The instructors received

a memorandum from Training Director Nesbitt dated January 3, 2007 advising them that: "There

is to be absolutely no Cell Phone usage while class is in session.  Students MUST turn all phones

off or leave them in their cars."  The JATC Board later instructed Training Director Nesbitt to

revise the rules to state that cell phones are not allowed in the JATC building during class hours

except in emergency circumstances and when the instructor is notified of the situation prior to

class. These changes were to be effective on January 24, 2007. Again the changes don't appear to have been made via an amendment to the Apprenticeship Policies or to have been distributed to each apprentice. The new rules were attached to a memorandum to all the classroom instructors, advising them of the revisions and directing them to read the rules to the students and strictly enforce them.

On March 7, 2007, Gregg was a probationary apprentice because he had not yet accumulated 2000 hours of related training. Gregg was a student in the Second Year Apprentice class taught by defendant Brandon Minier. There were six apprentices, including Gregg, in Minier's Second Year class. Training Director Nesbitt attests that before class that evening, he met with Instructor Minier and reviewed with him the prohibition on cell phone use in the building at any time during class hours. Gregg testified in his deposition that Minier did not (then or at any other class) read or review the written rule's language with the class, but on March 7 merely told the students they couldn't have their ringers on during class. Ironically, no sooner had he announced this than Minier's own phone rang. The affidavits of apprentices Scot Stookey and Ben Eichman contradict plaintiff Gregg's deposition testimony, in that Stookey and Eichman claim that on March 7 Minier read the cell phone rule to the class and told them to "turn our cell phones off for the night and then leave them in our cars on future class nights."

At break-time in the middle of the class, Gregg's cell phone received a call. He answered it, said "hello," and began to walk between Minier and the rest of the class as he spoke on the phone. [Defendants do not appear to contend that the phone rang out loud.] Minier told Gregg he had to leave for violating the cell phone rule. Gregg testified in his deposition that the oral instructions Minier had given before class required phones to be configured not to ring aloud, but

did not prohibit cell phone use during the class break. Gregg also testified that other apprentices talked on their phones during the same break and had food in the classroom but were not asked to leave. Gregg refused to leave, based on his expressed belief that Minier was racially discriminating in his enforcement of a policy different than the one stated at the beginning of class, and told Minier that Training Director Nesbitt should be called to the scene.

Minier got Fifth Year Instructor Ray Fuller from his nearby classroom, and brought Fuller back to help deal with Gregg. Gregg continued to insist he would not leave the classroom until Training Director Nesbitt arrived, and pointed out to Fuller the other students with food in the classroom. When Nesbitt later arrived, Gregg complained that other apprentices also had cell phones, which they showed Nesbitt they did, and that others were also eating in the classroom in violation of the Classroom Rules. Eventually Gregg agreed to leave the classroom and go to Nesbitt's office. After further discussion, Gregg left the building. JATC claims that this incident disrupted two other classrooms as well as Gregg's own class.

Nesbitt called JATC Board President Lovitt and reported that Gregg had created a disruption at the Training Center. The Apprenticeship Policies provide that an apprentice sent home from class by an instructor will not be re-admitted to the class until he appears before the Committee. Nesbitt sent Gregg a notice to appear at a meeting of the Board on March 12, 2007. Gregg notified the JATC office that he was out of town and would be unable to attend the March 12 meeting. The JATC office received letters from Gregg dated March 7 and March 12, both of which Nesbitt provided to the JATC Board. The letters set forth the ways in which Gregg believed he had been discriminated against in the selective enforcement of classroom policies and had been subject to racially-motivated verbal abuse by several fellow apprentices. The five

members of the Board present at the March 12 meeting received copies of Gregg's two letters, along with written statements by Minier and Nesbitt. Minier and Nesbitt were also present at the meeting and spoke concerning the events of March 7.

No decision was reached at this March 12 meeting as to Gregg's future in the apprenticeship program, other than to require Gregg to meet with the Board before he could return to class. Lovitt called Gregg to advise him that he could not return to class until he appeared before the committee. Gregg was present at the March 20, 2007 meeting of the Board, at which he spoke. Gregg was asked to leave the meeting and Lovitt called Fifth Year Instructor Fuller to review the events of March 7.

The Board deliberated and decided to terminate Gregg from the apprenticeship program, basing the termination on Gregg's refusal to obey his Instructor's direction to leave the classroom and his creation of a disturbance that disrupted the entire school. The Board rejected Gregg's claim of discriminatory treatment, concluded that Gregg's behavior on March 7 was unjustified, and that he should be terminated from the apprenticeship program pursuant to §IV(A)(6) of the Apprenticeship Policies. That section generally provides that for "disruptive, delinquent or disrespectful behavior," an apprentice may be immediately sent home by an instructor and may be terminated from the program. The termination letter sent to Gregg summarized the decision as "based on policies that you have violated and performance issues." [DE 232-3, p. 38].

Gregg did not complain to Local 305 of discrimination or retaliation in the apprenticeship program, or seek Local 305's help to file a grievance on his behalf, until after the events of March 7, 2007. At some time thereafter, Gregg had a conversation with Marvin Foote, Local

305's Business Manager and Financial Secretary, in which, according to Gregg's interrogatory answers, Foote refused to give him the grievance filing information Gregg requested or the Bylaws and Constitution of the union which would contain the grievance process information he wanted. In his deposition, Gregg testified that he had never asked for a copy of the Bylaws or Constitution, and admitted that when talking to Foote he didn't know exactly what he was asking for, but wanted to file a grievance to get the matter of what he believed to be discriminatory treatment by JATC to the international union. Foote's supplemental affidavit states that Gregg never asked him to file an internal union charge against another member of Local 305.

On April 25, 2007, Gregg filed an unfair labor practice charge against Local 305 with Region 25 of the National Labor Relations Board. The charge alleged that Local 305 had failed in its duty of fair representation of Gregg by discriminatorily removing Gregg from the apprenticeship program because of his race and refusing to represent Gregg in an appeal before the JATC. On July 31, 2007, the NLRB dismissed Gregg's charge, finding that the evidence was insufficient to establish that he was removed from the program based on race and that the evidence did not disclose the existence of an appeal procedure in which Local 305 could have assisted Gregg.

As a member of Local 305, Gregg was required to pay monthly membership dues of $29, to be paid quarterly in advance. In 2007, Local 305 sent three written notices to Gregg of dues delinquencies. Gregg's membership in Local 305 was administratively terminated on September 28, 2007 as a result of his failure to pay dues for the entirety of 2007.

**Discussion**

**I. Claims Against JATC, Nesbitt and Lovitt**

    A. <u>Race-Based Termination</u>

    Defendants JATC, Nesbitt and Lovitt acknowledge that both Title VII and §1981 prohibit

JATC from discriminating on the basis of race in its operation of apprenticeship training. *See* 42

U.S.C. §2000e-2(d).[2] The same analytical rubric applies to both Title VII and §1981. *McGowan*

*v. Deere & Company*, 581 F.3d 575, 579 (7th Cir. 2009). The *prima facie* case required of Gregg

is a demonstration that: (1) he is a member of a protected class; (2) his performance as an

apprentice was satisfactory; (3) he suffered an adverse action; and (4) he was treated less

favorably than one or more similarly situated apprentices not within his protected class. *See*

*Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). If he establishes

a *prima facie* case, the burden shifts to JATC to proffer a legitimate, nondiscriminatory reason

for its action. *Burks v. Wisc. Dep't of Transp.,* 464 F.3d 744, 751 (7th Cir. 2006). If JATC does

so, the burden shifts back to Gregg to produce evidence showing JATC's proffered reason is a

pretext for discrimination. *Id.*

    JATC, Lovitt and Nesbitt contend that Gregg fails to demonstrate that he performed

satisfactorily in the apprenticeship training program and that similarly situated apprentices not in

his protected class were treated more favorably. As to a race-neutral basis for Gregg's

---

    [2] Section 2000e-2(d), entitled "Training programs," provides that: "It shall be an
unlawful employment practice for any employer, labor organization, or joint labor-management
committee controlling apprenticeship or other training or retraining, including on-the-job
training programs to discriminate against any individual because of his race, color, religion, sex,
or national origin in admission to, or employment in, any program established to provide
apprenticeship or other training."

10

termination as an apprentice, JATC cites the uniqueness of Gregg's disruptive behavior on the evening of March 7 as defeating elements two and four of the *prima facie* case, and as supplying JATC's legitimate non-discriminatory reason for Gregg's discharge from the program, even if a *prima facie* case is met.

Gregg's position is that at the time of the March 7 incident, he was performing satisfactorily as an apprentice. Gregg suggests that the basis for his discharge is pretextual, as shown by comparison with white apprentices called before the Board but given multiple opportunities to correct unacceptable behavior, and because other white classmates were not disciplined that same night for their infractions of the new cell phone rule and the existing food ban. "Here, the parties dispute the second and fourth prongs as well as the pretext analysis. When an employee claims that he is qualified and that the employer is lying about the reasons for an adverse employment action, the second prong and the pretext question merge... Therefore, we begin with the fourth prong of the *prima facie* case." *McGowan*, 581 F.3d at 579, citing *Peirick v. IUPUI Athletics Dep't,* 510 F.3d 681, 687 (7th Cir.2007).

Gregg claims that only the written policy – the one prohibiting cell phones in the building – should have been enforced that night. At least five white apprentices had cell phones in the building that night and nothing was done to them. So from Gregg's point of view, either everyone should have been sent home for violating the policy, or no one at all. The problem arose when he – the only black apprentice – was singled out. What's more, the record reflects that white apprentice Mary Trammel had a cell phone violation a week later on March 14, and although she was sent home from class as a result, she was not made to appear before the Board as the Apprenticeship Policies require, much less terminated as a result. The existence of

disputes of fact as to the policy then in force and whether Gregg violated it, and as to the even-handed enforcement of the policy both on March 7 and thereafter, preclude summary judgment.

JATC claims that Gregg was disruptive on the night in question and that is the real reason he was fired. But the alleged disruption is also subject to disputes of fact. Gregg claims he wasn't disruptive, and the only reason he refused to leave that night was because he was engaging in protected activity – opposing the JATC's discriminatory enforcement of the cell phone policy. So that too must be sorted out by a jury.

In sum, there are a number of questions of fact relating to Gregg's race-based termination claim. They include:

•  What rule was in force on March 7, 2008 in Minier's classroom concerning cell phones?

•  Did Kevin Gregg violate that rule?

•  Was the rule enforced differently that night and thereafter based on the race of the apprentice?

•  Did JATC terminate Gregg's apprenticeship because of a racially discriminatory enforcement of the cell phone policy?

•  Was any disruption caused by Gregg on March 7 the reason for his termination from the apprenticeship program?

Because both proffered non-discriminatory bases for Gregg's termination – the enforcement of the cell phone policy and the disruption Gregg's response caused – are subject to genuine disputes of material fact not capable of determination by way of summary judgment, I will deny the motion by JATC, Nesbitt and Lovitt as to the race discrimination claim based on Gregg's termination.

B.  Retaliation

Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Section 1981also encompasses retaliation claims, and the same elements apply to both claims.  *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009), citing *CBOCS West, Inc. v. Humphries,* 553 U.S. 442  (2008).

A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof.  *Humphries,* 474 F.3d at 404.  The direct method requires a plaintiff to demonstrate that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two.  *Argyropoulos v. City of Alton,* 539 F.3d 724, 733 (7th Cir.2008); *Humphries,* 474 F.3d at 404.  If this showing is contradicted, the case must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse action against the plaintiff even absent a retaliatory motive. *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848 (7th Cir. 2007).

Under the indirect method, the first two elements remain the same, but instead of proving a direct causal link, the plaintiff must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination. *Argyropoulos,* 539 F.3d at 733.  Once a *prima facie* case under the indirect method is established, the defendant must articulate a nondiscriminatory reason for its action. The burden thereafter remains with the plaintiff to demonstrate that the defendant's reason is pretextual.  *Nichols v. So. Ill. Univ.-Edwardsville,* 510 F.3d 772, 785 (7th Cir. 2007).

The "opposition clause" of Title VII's retaliation provisions "covers conduct such as 'complaining to anyone...about allegedly unlawful practices; *refusing to obey an order because the worker thinks it is unlawful under Title VII*; and opposing unlawful acts by persons other than the employer – e.g., former employers, union, and co-workers.'" *Niswander v. Cincinnati Insurance Company*, 529 F.3d 714, 721 (6th Cir. 2008), quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) [emphasis added]. "[T]he only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of [the employee's] opposition must be reasonable." *Johnson*, 215 F.3d at 580. Protected activity for Title VII purposes thus requires Gregg to demonstrate that he complained about an act that he reasonably believed in good faith violated Title VII. *Firestine v. Parkview Health System, Inc.*, 388 F.3d 229, 234 (7th Cir. 2004).

Defendants suggest that Gregg's retaliation claims would have to be based on the two letters sent by Gregg after the March 7 incident, one dated March 7 and the other March 12, because there were no prior complaints or other protected activity for which retaliation could claim to have been made. But this overlooks Gregg's refusal to obey Minier's order to leave on March 7 as another species of protected activity. Gregg clearly believed that he was the victim of discriminatory discipline that night, and he refused to obey the resulting order. Although opposition to discrimination may lose its protection where it becomes unreasonable, a determination as to the reasonableness of Gregg's conduct here cannot be made as a matter of law in the summary judgment context. A jury must determine the reasonableness of his Gregg's actions.

Defendants argue that more than a coincidence of timing is needed to support a causal link between the Board's receipt of the letters and Gregg's termination from the apprenticeship program on March 20.   But the facts of this case suggest that Gregg may achieve the relatively rare "telling temporal sequence" that can establish the required nexus.  By "telling," the Seventh Circuit means "that the employer's adverse action follows fairly soon after the employee's protected expression," examples being one day and one week.  *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998), quoting *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir. 1998).  Here the claimed protected activity at the Training Center on March 7, and the letters dated March 7 and March 12, were followed by the termination decision at the March 20 meeting (delayed from the March 12 meeting because Gregg was unable to attend) , an interval sufficiently close to meet the "telling temporal sequence" standard.  This is particularly so where one of the avowed bases for the termination decision is the same conduct as is claimed to be protected activity.  As the Seventh Circuit observed in *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781 (7th Cir.2007), "[t]he causal link of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action." *Id.* at 793.  This chain of events is so close that a reasonable finder of fact could infer the requisite causation from it.

Disputed questions of fact material to the retaliation claim include:

• Was Gregg's response to the directive to leave class on March 7 reasonable, in light of his belief that he was receiving racially discriminatory discipline?

• If so, did JATC terminate Gregg's apprenticeship because of Gregg's response to the directive to leave class on March 7?

In sum, I cannot conclude as a matter of law that Gregg will be unable to persuade a jury that he engaged in protected activity and was terminated in retaliation for that activity. Because both the potential non-discriminatory bases for Gregg's termination – violation of the cell phone policy and creating a disturbance in class – are subject to disputes of fact relevant to their race-neutrality, neither can serve as the type of "unrebutted evidence of a noninvidious reason for the adverse action" that can entitle the movants to summary judgment. *Pantoja*, 495 F.3d at 848. The motion for summary judgment on the retaliation claims will be denied.

C. Other Claims of Discrimination

JATC, Nesbitt and Lovitt address a number of issues or incidents Gregg has referenced in an effort to demonstrate that they are insufficient to support a claim for race discrimination. For example, Gregg complains about being required to appear before the JATC Board after being discharged by an employer (JACE Electric) to whom he was assigned to work. But the evidence establishes that all the other apprentices in the program with Gregg who were discharged by an employer before or after Gregg's time in the program were likewise required to appear before the Board, as Gregg was. So Gregg can't point to similarly situated employees not in his protected class who were treated more favorably, which dooms this claim of discrimination. As a matter of law, then, the undisputed facts support summary judgment as to any discrimination claim relating to the handling of Gregg's termination by JACE Electric.

Gregg also cites instances of what he characterizes as discriminatory inconsistency in the handling of apprentice discipline, on matters such as whether apprentices were required to appear before the Board in the event of rules infractions, whether apprentices were given prior written notice of the specific allegation/issue they faced when called before the Board, and

whether apprentices were given an opportunity to correct any shortcoming. Even if properly supported by admissible evidence (which much of this is not), these assertions do not demonstrate the sort of tangible and material impact on Gregg that is actionable as an adverse action. *Pantoja*, 495 F.3d at 847.

The same is true of Gregg's allegations about JATC's handling of apprenticeship records and Monthly Work Reports. Although Gregg received a notice for failure to turn in several MWR's, so did two white apprentices in similar circumstances. Moreover, the receipt of such a notice is not an adverse action for purposes of actionable race discrimination.

Gregg asserts that he received discriminatory treatment in the handling of a missing textbook. After discarding what he believed to be a textbook used only in the first year, Gregg was given "unexcused absences" by Minier four times in fall 2006 for coming to class without his book and without his completed homework. Because Section IV(B) of the Apprenticeship Policies provide for a maximum of three absences during the school year, Nesbitt then noticed Gregg to appear before the Board. Then Gregg came to Nesbitt and explained about the book. Nesbitt wouldn't order a new book unless it was paid for in advance, which Gregg did not do. At his appearance before the Board, Gregg explained his book issue, and the Board authorized Nesbitt to order the replacement book without prepayment and Gregg received no discipline. JATC itemizes other (white) apprentices called before the Board during Gregg's time for various similar incidents. Gregg's response is to argue that he was never told he had to retain the book from the previous year and that the matter shouldn't have been allowed to escalate so far before it was brought before the Board. This matter did not result in an adverse consequence of the sort that is actionable as discriminatory treatment.

As to Gregg's allegation that he suffered discrimination with respect to work assignments, JATC argues that Gregg has no evidence of a work assignment for which he was passed over. Gregg swears (without showing how he'd have personal knowledge of this) that Nesbitt gave work assignments to whites and passed Gregg over on four particular dates. But the absence of admissible evidence in support of the necessary showing of different treatment of white apprentices is fatal to this claim.

In sum, Gregg has failed to submit evidence in response to the motion for summary judgment that creates a genuine issue of fact that might prove actionable discrimination based on any of these various treatments or incidents. JATC, Nesbitt and Lovitt are therefore entitled to summary judgment on these theories.

D. Hostile Work Environment Claim

None of the various incidents discussed above can support a hostile environment claim, any more than they support a claim of discrimination. Just as each failed to involve the type of adverse consequence necessary for a discrimination claim, none of them involves severe or pervasive effects that could be said to have altered the environment of Gregg's apprenticeship, which is a requirement of a hostile work environment claim. To demonstrate that the harassment was severe or pervasive, Gregg would have to show (among other things) that he subjectively perceived, and a reasonable person would objectively perceive, the work environment to be abusive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993). Gregg has not come close to meeting this difficult standard.

18

One more matter needs to be considered on the subject of hostile environment, namely Gregg's allegations of name-calling and verbal abuse from fellow apprentices. But Gregg offers no admissible evidence to support a determination as to what occurred, or whether its nature and frequency were severe or pervasive enough to alter the conditions of his apprenticeship to create a hostile environment. *Berry*, 2010 WL 3294720 at *3. Nor does Gregg demonstrate that JATC was aware of the issue so as to support JATC's liability for failing to remedy it. This is important because an employer can only be liable for "a co-employee's harassment . . . [if it had] 'been negligent either in discovering or remedying the harassment.'" *Parkins v. Civil Constructors, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (*quoting Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). There is no evidence that the Defendants were negligent in failing to discover the alleged harassment here and so Defendants are entitled to summary judgment on Gregg's hostile environment claims.

E. <u>LMRDA Claims</u>

The third amended complaint invokes 29 U.S.C. §411, the "Bill of rights" provision of the Labor-Management Reporting and Disclosure Act or LMRDA. The nature of Gregg's claim under §411 is not addressed in the complaint, and so it is unclear. JATC reasonably suggests that the claim is pursuant to subsection (a)(5), entitled "Safeguards against improper disciplinary action." But this type of claim only applies to "labor organizations." Under the applicable statutory definition, found at 29 U.S.C. §402(i), "labor organization" are those entities that "deal[] with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment." JATC does none of these things. In response to

JATC's motion, Gregg does not dispute this assertion, and so I conclude that JATC is entitled to summary judgment as to any claim against it under the LMRDA.

E.  Intentional Infliction of Emotional Distress

JATC, Nesbitt and Lovitt contend that any emotional distress claim against them is subject to summary judgment because the conduct alleged does not meet the high standard applicable to such a claim.  Under Indiana law, in order to support recovery, the conduct must be so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.  *Branham v. Celadon Trucking Services Inc.*, 744 N.E.2d 514, 523 (Ind.Ct.App. 2001); *Creel v. I.C.E. Assoc. Inc.*, 771 N.E.2d 1276, 1282 (Ind.Ct.App. 2001).

Whether discriminatory or not, whether retaliatory or not, the treatment of Gregg by all parties in this case was not the sort of extreme and outrageous abuse as to be properly characterized as atrocious and utterly intolerable.  The facts of the case do not, as a matter of law, meet the rigorous requirements of the tort of intentional infliction of emotional distress. Gregg offers no argument to the contrary in his opposition to the motion of JATC, Nesbitt and Lovitt, in whose favor summary judgment is granted on this claim.

F.  Breach of Contract

As best I can tell, Gregg's breach of contract claim appears to be based on the National Standards of the NJATC as incorporated in Gregg's indenture of apprenticeship, and specifically to be a claim that JATC breached those standards by terminating Gregg as an apprentice before giving him the required "reasonable opportunity for corrective action."  Third Amended Complaint [DE 96], pp. 4 & 5.  The pertinent provision of the Training Standards reads: "The

20

apprenticeship agreement may be canceled at the request of the apprentice or may be suspended for a specified period of time, canceled, or terminated by the JATC, for good cause, with due notice to the apprentice and a reasonable opportunity for corrective action." Training Standards, Section XXI(B) [DE 232-2, pp.66-67].

In support of summary judgment in its favor, JATC cites its long list of what it believes to have been Gregg's shortcomings[3], and contends that they show that Gregg was given more than a reasonable opportunity to improve before he was terminated from the program. Furthermore, because Gregg's termination did not immediately follow those issues, but was imposed later ostensibly for Gregg's violation of the cell phone policy and/or the disruption of classes, it is appropriate to consider what the Training Standards provision requires in the event that an apprentice is charged with breaches of classroom decorum, such as were at issue here.

Suppose an apprentice were to go berserk in the middle of class and set fire to the room. The Training Standards would not be breached if he were discharged from the program after due notice and a hearing before the Board, because the only "reasonable opportunity for corrective action" would be the opportunity to explain such conduct to the Board's satisfaction. To equate "corrective action" with "a second chance to show you won't do it again" is not reasonable with respect to intentional classroom conduct. Although the alleged violation of the cell phone policy and the disruption to the evening's classes involved here are far less extreme than my hypothetical, I conclude that the notice and hearing Gregg received were adequate to meet the requirements of the Training Standards provision. This conclusion is further supported by the

---

[3] These include the earlier-discussed incidents of Gregg's termination by JACE Electric, his lost textbook, and issues about Monthly Work Reports.

much more detailed provision of the Apprenticeship Policies governing conduct during training, which authorizes termination from the program as discipline for "cheating, disruptive, delinquent or disrespectful behavior" and makes no reference to a "second chance" but merely to an appearance before the Committee with an opportunity, just as Gregg had, to "satisf[y] the Committee that he/she is willing to abide by the Fort Wayne Electrical JATC Policies." [DE 232-2, p.25]. I will grant summary judgment to JATC on the breach of contract claim because on the undisputed facts, no reasonable jury could find a breach of the provision at issue.

G. Claims against Nesbitt and Lovitt as Individuals

I dismissed the LMRDA and Title VII claims against Nesbitt and Lovitt (but not the §1981 claims) in an order of August 18, 2009 [DE 146]. Now that only the discriminatory discharge and retaliatory termination claims have survived summary judgment, I must determine whether either of the two individual defendants can be liable under either theory. Both of the surviving claims are based on Gregg's termination from the apprenticeship program. The decision to discharge Gregg was made by the six-member Board of the JATC, of which Nesbitt was not a member and Lovitt was only one vote. Neither Nesbitt nor Lovitt can be said to be the decisionmaker responsible for Gregg's termination, and neither can be liable under §1981 on that basis. *Cerutti v. BASF Corporation*, 349 F.3d 1055, 1066 (7th Cir. 2003); *Dolson v. New York State Thruway Authority*, 80 Fed.Appx. 694, 696 (2nd Cir. 2003).

In sum, all of the claims against Nesbitt and Lovitt as individual defendants are disposed of, either because they have previously been dismissed, or because they are now found to be subject to summary judgment in their favor.

**II. Claims Against Local 305**

The claims against Local 305 are even less precise than those described above against JATC. So as to give Gregg the benefit of all doubt, I will construe his pleadings as asserting all claims against Local 305. First, Local 305 is entitled to summary judgment on any claim disposed of as a matter of law on JATC's motion for summary judgment, because regardless of any theory of vicarious liability, Local 305 cannot be liable where there is no underlying liability for harassment, discrimination, breach of contract or emotional distress. Summary judgment will therefore be granted to Local 305 on Gregg's claims for hostile environment, discrimination other than by termination, breach of contract and intentional infliction of emotional distress, as earlier analyzed.

A. Discrimination and Retaliation Claims

As to the claims of discriminatory termination and retaliation, which have survived summary judgment as against JATC, Local 305 argues that there exists no basis for its vicarious liability for the alleged conduct. There is no claim that Local 305 itself terminated Gregg's apprenticeship. That determination was made by the JATC, a six-member Board of which Local 305 appointed three members and NECA appointed three members. In granting NECA's motion to dismiss the §1981 claim against it, I have already applied the holding of *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375 (1982), to reject Gregg's claim that NECA's tie with the JATC supports vicarious liability. *See Opinion and Order* of 11/18/2009 [DE 179], p. 4. Under *General Building*, the role in appointing half of the JATC Board does not meet the standard of an agency relationship because a right of control is not "inferable merely from the power...to appoint half of the JATC's trustees." *General Building*, 458 U.S. at 394-95. I have

23

already held that Gregg's allegation that NECA "knowingly allowed/condoned" actionable conduct by JATC is conclusory and insufficient to state a claim of NECA's liability, and the same is true of Local 305. *Id.*

NECA and Local 305 have the same role with respect to JATC, and do not manage or operate JATC, or control its actions. Although a union that *controls* apprenticeship and training programs can be liable under Title VII for their discriminatory operation, here there is no showing that Local 305 controlled the manner in which JATC operated the apprenticeship program or had any control over Gregg's termination. *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 654 (7th Cir. 2006). As the Supreme Court has held: "the doctrine of *respondeat superior*... would not support the imposition of liability on a defendant based on the acts of a party with whom it had no agency or employment relationship." *General Building*, 458 U.S. at 392.

Nor can the involvement of Dave Lovitt or John Nesbitt in Gregg's termination be the basis for imputing liability to Local 305. Lovitt, the JATC Board President, was also the vice-president of Local 305. This dual role, without more, does not create vicarious liability, particularly in view of the duty of neutrality imposed by ERISA on such board members. *Id.* at 395, citing *NLRB v. Amax Coal Co.*, 453 U.S. 322 (1981) ["It is entirely possible that the trustees, once appointed, owe a fiduciary duty to the JATC and the apprentices enrolled in its programs, rather than to the entities that appointed them"]. Nesbitt was an employee of JATC as its Training Director, but was not an officer or agent of Local 305 during the period of Gregg's apprenticeship. The allegedly discriminatory or retaliatory decision – to terminate Gregg's

apprenticeship – was made by a vote of the JATC Board, and cannot be imputed to Lovitt or

Nesbitt individually, and so cannot through them be imputed to Local 305.

B. LMRDA Claim

As earlier noted, the nature and basis of Gregg's invocation of the LMRDA is unclear.

Local 305 first interprets Gregg's LMRDA claim against it to be based on an assertion that Local

305 should have filed a grievance challenging Gregg's dismissal from the apprenticeship

program. To such a claim, Local 305 responds that it lacks authority over JATC and does not

have the power to file grievances challenging decisions by the JATC Board. Local 305 correctly

distinguishes JATC from employers against whom the union might pursue a grievance on

Gregg's behalf, because employers are subject to grievances via their collective bargaining

agreement with the union. The JATC was not Gregg's employer and had no collective

bargaining agreement with the union. To the extent this interpretation of Gregg's claim is

reminiscent of a claim of the union's breach of the duty of fair representation, Local 305 points

out that Gregg made such a claim in his second amended complaint, but omitted it from the third

amended complaint, and that such a claim would be barred by the applicable six-month statute of

limitations.

In the alternative, Local 305 interprets Gregg's LMRDA claim against it to be based on a

failure to provide Gregg with due process as provided under §411(a)(5). That section provides

that no member of a labor organization may be disciplined (for other than nonpayment of dues)

unless served with written specific charges, given a reasonable time to prepare his defense, and

afforded a full and fair hearing. I have already observed that JATC is not a labor organization

within the meaning of this statute, so that its disciplinary proceedings are not subject to this

provision.  On the flip side, Local 305 is certainly a labor organization, but the provision as applicable to Local 305 governs discipline meted out at its level, that is, union membership rather than participation in the JATC apprenticeship program.  Although JATC removed Gregg from the apprenticeship program on March 20, 2007, Gregg remained a member of Local 305 until his membership was administratively terminated on September 28, 2007 for his failure to pay dues.  And the language of §411(a)(5) expressly exempts action "for nonpayment of dues" from its provisions of procedural safeguards.  Local 305 is entitled to summary judgment as to any claim asserted under the LMRDA.

C.  <u>Assistance with Internal Union Charge</u>

The real gist of Gregg's claim against Local 305 is this.  Gregg wanted to file a complaint of some kind challenging his expulsion from the apprenticeship program as discriminatory.  He may have used the term "grievance" in error when he sought assistance from Marvin Foote, but it seems pretty clear what it was he wanted to complain about, and that someone assisting him in good faith could understand that he wanted to charge fellow union members running the apprenticeship training with discriminatory treatment.  If Foote chose to respond only literally to Gregg's request to file a "grievance," a species of thing inapplicable because he wasn't charging an employer with violating a CBA, would that obtuse response and general unhelpfulness be actionable?

My answer is no, for the following reasons.  Gregg has not invoked any statutory provision that would be violated by this occurrence.  Gregg offers no evidence to support a determination that any such non-cooperation on Foote's part was motivated by race or retaliation. Finally, Gregg fails to identify a contractual agreement which could be breached by

such conduct.  In short, no legal basis is demonstrated for Local 305 to be liable to Gregg for *failing to help him* file an internal union charge against fellow union members whom he believed had discriminated against him.  Even under Gregg's version of the facts, Local 305 did not *prevent him* from filing an internal union charge against Lovitt or Nesbitt or anyone else.  The parties agree that such a charge is authorized and available under Article XXV of the Bylaws and Constitution of the IBEW, and can be filed in writing with the Local or, if against an officer or representative of a local union, with the Vice President of the IBEW.  Gregg could have filed such a charge at any time, and Foote's failure to help Gregg figure out the mechanism for doing so is not shown to support liability on any legal theory.

For all the foregoing reasons, I conclude that Local 305 is entitled to summary judgment on all claims asserted against it by Kevin Gregg, and Local 305's motion will be granted.

## Conclusion

Fundamentally, this case is about whether race discrimination and related retaliation were at the heart of Gregg's dismissal from the apprenticeship program, not second-guessing and nit-picking JATC's administration of the program throughout Gregg's tenure and not Local 305's non-existent role in the dismissal decision and its aftermath.  What remains for trial are the race discrimination and retaliation claims against JATC under Title VII and §1981 based on Gregg's discharge.

ACCORDINGLY:

Plaintiff's claims against defendant Brandon Minier are DISMISSED pursuant to Fed.R.Civ.P. 25(a)(1) for lack of a timely motion for substitution following the filing of a suggestion of Minier's death.

The motions to strike filed by defendants JATC, Lovitt and Nesbitt [DE 251] and defendant Local 305 [DE 254] are GRANTED IN PART AND DENIED IN PART, as indicated in the foregoing opinion.

The motion for summary judgment filed by defendants JATC, Lovitt and Nesbitt [DE 230] is DENIED IN PART with respect to the discriminatory termination and retaliation claims against JATC under Title VII and §1981, but in all other respects is GRANTED.

The motion for summary judgment filed by defendant Local 305 [DE 234] is GRANTED.

**SO ORDERED.**

ENTERED:    November 1, 2010.


  /s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT